SCOTT J. SAGARIA (BAR # 217981)
ELLIOT W. GALE (BAR #263326)
JOE B. ANGELO (BAR #268542)
SCOTT M. JOHNSON (BAR #287182)
**SAGARIA LAW, P.C.**
2033 Gateway Place, 5th Floor
San Jose, CA 95110
408-279-2288 ph
408-279-2299 fax

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| TRACEY MCGIVNEY, <br><br> Plaintiff, <br><br> v. <br><br> Experian Inc, Equifax, Inc.; Meriwest Credit Union; and DOES 1 through 100 inclusive, <br><br> Defendants. | CASE NO. <br><br> COMPLAINT FOR DAMAGES: <br><br> 1. Violation of Fair Credit Reporting Act; <br> 2. Violation of California Consumer Credit Reporting Agencies Act; |

COMES NOW Plaintiff TRACEY MCGIVNEY, an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt included in Plaintiff's Chapter 13 bankruptcy.

2. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the

banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

3. There exists today in the United States a pervasive and fundamental misunderstanding about the long term impact filing a consumer bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

4. The *majority* of consumer Debtors who file consumer bankruptcy do so to *raise* their FICO Score and remedy their poor credit worthiness.

5. It is entirely possible for consumer Debtors to have over a 700 FICO Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

6. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys a consumer's credit worthiness for ten years.

7. In an effort to perpetuate the aforementioned bankruptcy myth, creditors intentionally and routinely ignore credit reporting industry standards for accurately reporting bankruptcies and debts included in those bankruptcies in an effort to keep consumers' credit scores low and their interest rates high.

8. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

9. These credit reporting issues are most prevalent in Chapter 13 bankruptcy filings.

10. Consequently, in the United States today it is objectively worse for consumers' credit worthiness to file Chapter 13 and pay back some or all of their debt, as opposed to filing Chapter 7 liquidation where Creditors generally receive nothing.

11. This was not the intent of Congress when enacting the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## **JURISDICTION & VENUE**

12. Plaintiff re-alleges and incorporates herein by this reference the allegations in each and every paragraph above, fully set forth herein.

13. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

14. This venue is proper pursuant to 28 U.S.C. §1391(b).

## GENERAL ALLEGATIONS

15. Plaintiff alleges that each and every defendant data furnisher was included in Plaintiff's Chapter 13 bankruptcy filing.

16. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

17. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

18. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's ability to reorganize and repair Plaintiff's FICO Score.

19. In the alternative Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

20. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

22. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

23. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

24. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

25. There are 28 FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

27. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

28. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

29. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.

30. Each of the five factors is weighted differently by FICO.

31. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

32. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.  Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

33. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

34. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

35. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

36. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

**Metro 2**

37. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

38. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

39. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

40. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

41. The CDIA is *The* expert on accurate credit reporting. In support of this allegation Plaintiff avers the following:

    a. The CDIA offers a FCRA certificate program for all CRAs.

    b. The CDIA offers a FCRA awareness program for all CRAs.

    c. The CDIA offers a FCRA Certificate program for DFs.

    d. The CDIA offers a FCRA awareness program for DFs.

    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

f.  The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

g.  The CDIA developed a credit reporting resource guide for accurately reporting credit.

42. The CDIA's Metro 2 is accepted by all CRAs.

43. The credit reporting accepted industry standards for reporting metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

44. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

45. The CRRG is not readily available to the public. It can be purchased online for $229.45.

46. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

47. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

48. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

49. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**e-OSCAR**

50. E-OSCAR is the web based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

51. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

52. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

53. When a consumer files bankruptcy certain credit reporting industry standards exist.

54. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

55. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

56. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

57. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

58. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

59. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

60. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

61. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

62. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

63. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

64. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

65. The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay exists to prevent *in personam* collection activity.

66. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

67. Under the Fair Credit Reporting Act a bankruptcy can be reported for ten years.

68. The ten-year rule for reporting runs from the date the bankruptcy was *filed.*

69. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

70. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.

71. Failure to reference the bankruptcy filing (CII field) and or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

**Pre Confirmation Credit Reporting Standards Regarding Balances and Ongoing Payments When All Borrowers File Chapter 13**

72. Certain credit reporting standards exist on how to accurately and completely report balances on consumer debts pre plan confirmation.

73. Pre confirmation the accepted credit reporting standard for accurately and completely reporting a balance included in a Debtor's chapter 13 plan is to report the outstanding balance amount as of the date of filing.

74. Pre confirmation the accepted credit reporting standard for accurately and completely reporting a scheduled monthly payment amount is to report the contractual monthly payment amount.

75. Pre confirmation the accepted credit reporting standard for accurately and completely reporting a past due balance is to report the past due amount as of the time the petition was filed.

76. Pre confirmation the accepted credit reporting standard for accurately and completely reporting ongoing payments is to report the Metro 2 indicator D in Field 18 which means no payment history available this month.

77. Within the credit reporting industry, the Metro 2 indicator D is seen as accurately and completely illustrating that the automatic stay of the bankruptcy is preventing ongoing collection activities against the debtor and creditors are not anticipating receiving payments directly from the debtor. The Metro 2 indicator D thus simultaneously illustrates to those making credit decisions that payments were NOT made and received but also NOT anticipated.

78. Deviation from the aforementioned credit reporting industry standards shall result in a more negative inference being drawn with respect to a consumer's credit worthiness.

**Post Confirmation Credit Reporting Standards Regarding Balances and Ongoing Payments When All Borrowers File Chapter 13**

79. Certain credit reporting standards exist on how to accurately and completely report balances and past due balances post plan confirmation.

80. Post confirmation the accepted accurate credit reporting standard for reporting balances is to report the balance owed under the Chapter 13 plan terms. The balance should decrease with payments made.

81. If the plan does not call for payments to be made on a particular debt the accurate credit reporting standard is to report a $0.00 balance.

82. Post confirmation the accepted accurate credit reporting standard for reporting past due balances is to report a $0.00 past due balance.

83. Post confirmation the accepted accurate credit reporting standard for monthly payments is the Chapter 13 plan payment amount.

84. Post confirmation the accepted accurate credit reporting standard for payment history is to report the Metro 2 indicator D each month. Reporting ongoing past due amounts and ongoing late payments are not generally accepted as accurate by the credit reporting industry.

85. Plaintiff alleges that the aforementioned industry standards are all readily available in the CRRG which each and every Defendant subscribes thereto.

86. The CDIA and credit reporting industry recognize that allowing Creditors to continuously report on going delinquencies and past due balances post confirmation would objectively make filing Chapter 13 and repaying Creditors exponentially worse for a consumer's credit worthiness as opposed to filing Chapter 7.  Thus, deviation from the aforementioned credit reporting industry standards shall result in a more negative inference being drawn with respect to a consumer's credit worthiness.

**Plaintiffs Bankruptcy Filing**

87. Prior to filing Chapter 13, Plaintiff pulled a credit report on April 2, 2013 to ensure all outstanding debt was properly listed and scheduled in Plaintiff's petition.

88. The credit report was pulled from a third party vendor CIN Legal Data Services.

89. Plaintiff alleges that all the information contained within the April 2, 2013 CIN report was compiled by information gathered by CIN directly from the three major CRAs- Experian Information Solutions, Inc.; Equifax, Inc. and Trans Union, LLC.

90. The CIN report contained within it Plaintiff's estimated credit score of 552 based on the information provided by the CRAs.

91. The CIN report also estimated Plaintiff's 12-month post-bankruptcy credit score at 653.

92. Plaintiff alleges such scores were based on anticipated accurate credit reporting industry standards.

93. Plaintiff filed for Chapter 13 bankruptcy protection on April 5, 2013 in order to reorganize and repair Plaintiff's credit worthiness and FICO Score.

94. Chapter 13 of the Bankruptcy Code is titled "***Adjustment of Debts*** of an Individual with Regular Income."

95. Chapter 13 allows financially overextended individual debtors to make greater voluntary use of repayment plans commensurate with each debtor's abilities, as the most effective means of improving, first, debtor relief, and second creditor recoveries.

96. Whether a debtor uses Chapter 7, Liquidation, or Chapter 13, Adjustments of Debts of an individual, congress intended bankruptcy relief be effective and should provide the Debtor with a fresh start.

97. Post filing, Defendants would not accept payments directly from Plaintiff.

98. Post filing, Defendants were not anticipating receiving payments directly from Plaintiff.

99. Under the terms of the confirmed Chapter 13 plan, unsecured Creditors are allowed a 0% disbursement of their filed claims over the course of Plaintiff's plan.

100. Plaintiff's plan was confirmed on April 9, 2014.

101. Once confirmed the plan became a final judgment with respect to the party's rights and liabilities.

102. The res judicata effect of confirmation may be eliminated only if confirmation is revoked or if the case is dismissed.

103. Confirmation of a plan prohibits actions by creditors inconsistent with the plan.

104. While confirmation of a plan is not a discharge it does **fix the terms** upon which claims are to be settled and both a confirmation order and discharge order are final orders.

105. The CDIA recognizes the finality of confirmation orders and the aforementioned credit reporting industry guidelines are specifically setup to harmonize the bankruptcy code and credit reporting guidelines.

106. Federal Rules of Bankruptcy Procedure ("FRBP") 3004 and 3021 mandate that distributions to creditors are on allowed claims only.

107. A proof of claim must be filed in order for a claim to be allowed. 11 U.S.C §502(a).

108. Thus failure to file a proof of claim results in zero distributions to a creditor through the plan.

109. In the case of an unsecured non priority claim failure to file a proof of claim sets the terms of repayment at $0.00 owed.

110. Item 1 of the official Proof of Claim form promulgated by the Supreme Court does not acknowledge past due amounts on unsecured debts.  The same proof of claim form, however, specifically asks for and requires a secured creditor to list the arrearage/past due amounts on a secured claim in item 4.

111. On March 28, 2016 Plaintiff ordered a three bureau report from Experian Information Solutions, Inc. to ensure proper reporting by Plaintiff's Creditors.

112. Plaintiff noticed _**3**_ different trade lines on the March 28, 2016 credit report all reporting inaccurate, misleading, or incomplete information that did not comport with credit reporting industry standards. Specifically, multiple trade lines continued to report Plaintiff's accounts with past due balances, inaccurate balances, and/or inaccurate monthly payments owed.   Some accounts even failed to register that Plaintiff was making payments on the account through Plaintiff's Chapter 13 plan.

113. In response, Plaintiff disputed the inaccurate tradelines via certified mail with Experian Information Solutions, Inc.; Equifax, Inc.; and TransUnion, LLC on September 13, 2016.

114. Plaintiff's dispute letter specifically put each Creditor on notice that Plaintiff had filed for bankruptcy and the account was not reporting the bankruptcy accurately or worse not at all. Plaintiff specifically requested each Creditor investigate the proper way to report Plaintiff's bankruptcy. Plaintiff noted that there should not be any past due balance reported, the account should not be listed as charged off, transferred or sold, with an inaccurate monthly payment or that the account is in collections. There should

not be any late payments reported after Plaintiff's case was filed and to ensure that the proper monthly payment was being reported. Last, Plaintiff noted that under *Gorman v. Wolpoff & Abramson*, Plaintiff expected the accounts to be reported disputed if the Creditor disagreed with Plaintiff's dispute.

115. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to each DF via an ACDV through e-OSCAR.

116. On October 26, 2016 Plaintiff ordered a second credit report from Experian Information Solutions, Inc.; Equifax, Inc. and TransUnion, LLC to ensure Plaintiff's accounts had been updated.

117. It was now over three years since Plaintiff filed for bankruptcy and Plaintiff's credit score was well below what accurate credit reporting industry standards would project.

*118.* Defendant Meriwest Credit Union was reporting Plaintiff's account, beginning in 9708xxxx, with a balance in the amount of $4,580.00, and multiple failures to pay listed in the 24 month payment history ***despite payments being made and received by Defendant.***

119. Defendant was reckless and intentionally ignored accurate credit reporting standards by choosing to disregard the court ordered treatment of its claim.

120. The terms of the plan show that this claim is to be treated as a secured debt and paid in full at an interest rate of 5%.

121. Defendant filed a proof of claim in the amount of $9,220.15. The trustees' accounting shows that there has been a disbursement of funds totaling $6,272.43, that the principle owed on the account totals $2,947.72, NOT $4,580 being reported

122. If this is not troubling enough, Defendant reported that Plaintiff failed to pay EVERY month from May 2014 through June 2015, despite Defendant actually receiving and accepting payments each one of those months.

123. The Trustees' accounting shows that payment was in fact made from May 2014 through June 2015. In addition to inaccurately reporting, Defendant is essentially reporting that the Trustee is lying about disbursements being made or that she's derelict in her duties.

124. The actions of the Defendants as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

125. The actions of the Defendants as alleged herein are acts in violation of the Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a).

## FIRST CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants and Does 1-100)

**Meriwest Credit Union –Failure to Reinvestigate.**

126. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

127. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

128. Defendants Meriwest Credit Union and Wells Fargo Bank, National Association violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

129. The CRAs provided notice to the Defendants that Plaintiff was disputing the inaccurate and misleading information but Meriwest Credit Union and Wells Fargo Bank, National Association failed to conduct a reasonable investigation of the information as required by the FCRA.

130. Based on Plaintiff's dispute, Defendants should have known their accounts were included in Plaintiff's Chapter 13 plan of reorganization. The most basic investigation would include a simple review of well-established credit reporting industry standards.

131. Plaintiff alleges Defendants did not review well established industry standards for credit reporting.

132. If Defendants had reviewed such standards Defendants would have seen their reporting was not in compliance and consequently inaccurate and or incomplete.

133. Such an investigation would be unreasonable.

134. Plaintiff also alleges that Defendants did not investigate whether Plaintiff filed for bankruptcy, whether their accounts were included, the terms of the plan, or whether or not the terms had been approved.

13

135.  The lack of investigation is unreasonable.

**Experian Information Solutions, Inc. and Equifax, Inc. – Failure to Reinvestigate Disputed Information.**

136.  Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

137.  Experian disseminated the inaccurate information contained herein to Kohls/CAPONE on October of 2016  and to Sprint on June 13, 2016. Experian is reporting the incorrect balance.

138.  Equifax disseminated the inaccurate information contained herein to Comenity Bank on Oct 24, 2016 and Comcast Bay Area on February 11, 2016. Equifax is reporting the incorrect balance and multiple failures to pay contained herein.

139.  After Plaintiff disputed the accounts mentioned above, each CRA was required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

140.  The most basic investigation required each CRA to send all relevant information via an ACDV to the furnishers which they did not do.

141.  Thus the CRAs failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

142.  In the alternative Plaintiff alleges that each CRA has its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

143.  Each CRA is not a passive entity bound to report whatever information a DF provides.

144.  Plaintiff alleges that each CRA is readily familiar with Metro 2 guidelines and credit reporting industry standards.

145.  ***In fact, each CRA sponsors and authorizes workshops hosted by the CDIA that teach the following to DFs***:

    a.   Do not report delinquencies post petition pre discharge in the payment history section regardless of Chapter 7 or Chapter 13. Instead report the Metro 2 indicator D.

    b.   In Chapter 13 cases do not report past due balances post confirmation.

c.    In Chapter 13 cases do not report balances that are inconsistent with the terms of the Chapter 13 plan.

d.    In Chapter 13 cases do not report monthly payments that are inconsistent with the terms of the Chapter 13 plan.

e.    The above reporting is the correct and accurate way to report debts included in consumer bankruptcy filings.

146.  Given the aforementioned, Plaintiff alleges that each CRA can and does suppress inaccurate information from being reported when DFs provide inaccurate information.

147.  Each CRA can and does instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

148.  Each CRA failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.

149.  Each CRA would have known that Plaintiff filed for Chapter 13 based on multiple other accounts reporting as much.

150.  Each CRA would have known that Plaintiff's plan had been confirmed based on multiple other accounts reporting as much.

151.  Each CRA would have known that failure to report a CII given that a Chapter 13 was filed did not comport with industry standards.

152.  Each CRA would have known reporting a past due balance post confirmation does not comport with industry standards.

153.  Each CRA therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

**SECOND CAUSE OF ACTION**
(Violation of California Consumer Credit Reporting Agencies Act
California Civil Code § 1785.25(a) Against Defendants and Does 1-100)

**Meriwest Credit Union and Wells Fargo Bank, National Association – Reporting Inaccurate Information to CRAs.**

15

154. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

155. In the regular course of its business operations, Defendants routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

156. Defendants intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not comport with well-established industry standards.

157. Plaintiff alleges that Defendants re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

158. Plaintiff also alleges that Defendants had reason to know that the information reported on Plaintiff's accounts were misleading, inaccurate, incomplete, and did not comport with well-established credit reporting industry standards.

159. Plaintiff alleges that Defendants had reason to know that by not comporting with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

160. Plaintiff alleges that the bankruptcy notices, disputes letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to Defendants of its misleading and inaccurate reporting as well as being noticed of the plan confirmation and proof of claim forms sent by the U.S. Bankruptcy Court.

161. Defendants failed to notify Experian Information Solutions, Inc. and Equifax, Inc. that the information Defendants re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

162. Defendants' communications of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiff's rights.

163. As a direct and proximate result of Defendants' willful and untrue communications, Plaintiff has suffered actual damages including but not limited to inability to properly reorganize under Chapter 13, reviewing credit reports from all three consumer reporting

agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, and such further expenses in an amount to be determined at trial.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;

3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31

4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o;


**SAGARIA LAW, P.C.**
Dated: January 23, 2017        */s/ Elliot Gale, Esq.*
Scott Sagaria, Esq.
Elliot Gale, Esq.
Attorneys for Plaintiff


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.


**SAGARIA LAW, P.C.**
Dated: January 23, 2017        */s/ Elliot Gale, Esq.*
Scott Sagaria, Esq.
Elliot Gale, Esq.

Attorneys for Plaintiff